UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA *ex rel.*
MATTHEW LEAHEY,

               Plaintiff,

        - versus -

THE FLOATING HOSPITAL; RENAISSANCE
HEALTHCARE OPTIONS, LLC; GLOBAL
COMMUNICATIONS SERVICES, INC.;
BEACON THERAPY SERVICES, INC.;
J&R SPEECH LANGUAGE PATHOLOGY
OF NASSAU COUNTY, P.C.; KENNETH
BERGER; TERRY BLACKWELL; RUSSELL
O'CONNELL; ELISSA THEILEN; BARBARA
LEHRER; DONALD MUIR; AMERICO
VARONE; BABU PUNNAN, M.D.; STATEN
ISLAND UNIVERSITY HOSPITAL,
GOLDSTEIN GOLUB & KESSLER, LLP,
and THE FLOATING HOSPITAL
FOUNDATION, INC.,

               Defendants.
--------------------------------------------------------x

**IN CAMERA AND UNDER SEAL**

**COMPLAINT**

06 Civ. _____

**JURY TRIAL DEMANDED**

     Plaintiff the United States of America *ex rel.* Matthew Leahey, by his undersigned

attorneys, alleges for his Complaint herein as follows.

## PRELIMINARY STATEMENT

     1.     This is a civil action brought by relator MATTHEW LEAHEY

("Relator" or "Plaintiff") on his own behalf and on behalf of the United States of

America against THE FLOATING HOSPITAL; RENAISSANCE HEALTHCARE

OPTIONS, LLC; GLOBAL COMMUNICATIONS SERVICES, INC.; BEACON

THERAPY SERVICES, INC.; J&R SPEECH LANGUAGE PATHOLOGY OF

NASSAU COUNTY, P.C.; KENNETH BERGER; TERRY BLACKWELL; RUSSELL

O'CONNELL; ELISSA THEILEN; BARBARA LEHRER; DONALD MUIR;

AMERICO VARONE; BABU PUNNAN, M.D.; STATEN ISLAND UNIVERSITY

HOSPITAL, GOLDSTEIN GOLUB & KESSLER, LLP and THE FLOATING

HOSPITAL FOUNDATION, INC. under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

(the "False Claims Act"), and the New York City False Claims Act (§ 7-801, *et seq.* of

Chapter 8 of Title 7 of the Administrative Code of the City of New York), to recover

damages sustained by, and penalties owed to, the United States, the State of New York

and the City of New York as the result of the Defendants having knowingly presented or

caused to be presented to the United States and other governments false claims for the

payment of funds disbursed under the New York State Medicaid Program, in each case in

excess of the amounts to which the Defendants were lawfully entitled, from

approximately 1997 through the present.

## JURISDICTION AND VENUE

2.    Relator brings this action under the False Claims Act pursuant to

31 U.S.C. § 3730 (b)(1).

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C

§§ 1331 and 1345.

4.    Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28

U.S.C. §§ 1391(b) and 1391(c) because a substantial part of the acts complained of herein

occurred in this district, including without limitation, acts proscribed by 31 U.S.C. §

3729. The Floating Hospital submits Medicaid claims to the State of New York by

submitting them to its Department of Social Services.

## THE PARTIES

5.      Relator and Plaintiff Matthew Leahey, a systems engineer, resides

in New Jersey.  He brings this action for violations of the False Claims Act on behalf of

himself, the United States pursuant to 31 U.S.C. § 3730(b)(1) and the governments of

New York State and New York City.

### The Defendants

6.      The Floating Hospital ("TFH"), a not-for-profit entity, licensed by

the New York State Department of Health ("DOH") under Article 28 of the New York

Public Health Law, is a freestanding diagnostic and treatment center, licensed under

Article 28 of the New York State health law, located in New York City.  TFH's address

had been Pier 11 Wall Street and the East River, but since it stopped using its ship in

2003, its main office has been 90 William Street, Room 1402, New York, New York

10038.      7.      Kenneth Berger became an employee of TFH in 1996 and became

its executive director in 2000.  He resides at 48 La Bonne Vie Drive, #48B, East

Patchogue, New York 11772.  Berger's tenure as TFH's executive director ended in mid-

November 2005 but he has remained a board member.

8.      Renaissance Healthcare Options, LLC ("Renaissance") is the

provider of therapists who serve people with developmental disabilities, chemical

dependency, mental illness, and physical disabilities and for whom TFH falsely billed

Medicaid.  Its address is 1800 Northern Boulevard, Suite 102, Roslyn, New York 11577.

9.      Americo ("Rick") Varone was Renaissance's Chairman from 1997

until June of 2000, as well as the chief executive officer of defendant Staten Island

University Hospital ("SIUH") which for a period of time, had a 40% ownership interest

3

in Renaissance.  His home address is 93 Minuteman Circle, Allentown, New Jersey 08501.

10.    Donald Muir had been Renaissance's president/chief executive officer when he signed the original 1997 contract with TFH on behalf of Renaissance. His home address is 11660 Regent Park Drive, Chardon, Ohio 44024.

11.    Russell O'Connell participated in Renaissance's proposed-contract presentations to TFH's Board of Trustees and was one of those who controlled the day-to-day operations at Renaissance.  His home address is 42 Sintsink Drive E, #5, Port Washington, New York 11050.

12.    Elissa Theilen initially was an employee of SIUH and reported to SIUH's CEO Varone and later worked under O'Connell at Renaissance.  Theilen's home address is 70 Hickory Road, New Hyde Park, New York 11040.

13.    Barbara Lehrer worked alongside Theilen at SIUH and Renaissance.  Her home address is 3 Harbor Court, Roslyn, New York 11576.

14.    Beacon Therapy Services, Inc. ("Beacon") was incorporated by Barbara Lehrer on August 21, 1998 and in 2002 replaced Renaissance as a vendor for TFH.  Beacon's address is the same as that of Renaissance, 1800 Northern Boulevard, Roslyn, New York 11577.

15.    J&R Speech Language Pathology of Nassau County, P.C. ("J&R") was incorporated by Barbara Lehrer on November 9, 1995.  Like Beacon, it shared Renaissance's address.

16.    Terence Blackwell, Jr. was a personal friend of Berger before Berger worked for TFH and helped to introduce Renaissance to TFH. His home address is 28 Addington Court, East Brunswick, New Jersey 08816.

17.    Global Communications Services, Inc. ("Global") was second in size to Renaissance with respect to the number of therapists for whom TFH falsely billed Medicaid. It was incorporated on March 15, 1995. Global used the address of 1979 Marcus Avenue, Suite 204, Lake Success, New York.

18.    Babu Punnan, M.D. was the President of Global. His home address is 3 Turf Lane, Roslyn Heights, New York 11577.

19.    Staten Island University Hospital ("SIUH") is a major acute care hospital and part of the North Shore University Hospital-Long Island Jewish Medical Center network and owned 40% of Renaissance at the time Renaissance contracted with TFH in 1997. 20.    Goldstein Golub & Kessler, LLP ("GGK") is the accounting firm that prepared the financial statements and audits of TFH during the period in question and gave it business and operational advice. GGK is located at 1185 Avenue of the Americas, New York, New York 10036.

21.    The Floating Hospital Foundation, Inc., which had the purpose of assisting the TFH, and was the recipient of $2,000,000 from TFH in 2001.

## FACTS

### Background

22.    New York State, through the Department of Social Services, administers the Medicaid Program. Title XIX of the Social Security Act (or the "Medicaid Act"), 42 U.S.C. §§ 1396 et seq., establishes a federally funded program to

provide Medical Assistance (or "MA") to financially indigent and medically needy citizens and legal aliens, including unwed mothers and children. States participate in Medicaid voluntarily. Once a State agrees to participate, it receives federal matching funds (also known as federal financial participation or "FFP") for qualified program expenditures in percentages that vary from 50% to 80% of the total, depending on per capita income within the state. New York participates in Medicaid. Approximately 55% to 60% of its MA expenditures are paid for with federal matching funds. Consequently, false claims against the New York program are false claims against the United States, the State of New York and the City of New York. Plaintiffs claims all arise out of fraudulent and otherwise unlawful practices by Defendants in their billing and collection of reimbursements from the New York State Medicaid Program.

23. The Floating Hospital ("TFH"), a licensed New York Diagnostic and Treatment Center, obtained authorization from Medicaid to bill $218 per patient-visit at its part-time clinics, the highest such rate approved by New York State's Department of Health. In 1997, it began billing and collecting reimbursement from Medicaid for part-time clinics' therapeutic treatments—speech/hearing, occupational and physical therapy and mental health sessions ("therapeutic" services)—provided at numerous locations throughout the New York metropolitan region, even though TFH had no right to bill or collect for such services because they did not occur at part-time clinics that were sufficiently connected to TFH to allow it to bill Medicaid. TFH falsely billed Medicaid from 1997 to 2004 for almost 300,000 of such services provided at these sites, even though such sites were not part-time clinics that had a billable affiliation with TFH. The services provided during these visits were not provided or furnished by TFH and,

6

therefore, should not have been billed by TFH as if they had been TFH services. Beginning in 1997 and continuing to at least 2004, this scheme generated at least $63 million in falsely reimbursed Medicaid claims.

24.    Under the provisions of the False Claims Act ("FCA" or the "Act"), private persons may enforce the Act on behalf of the United States to recover amounts paid by, or owed to, the government due to false or fraudulent claims and statements.  This complaint is also brought under the New York City False Claims Act (§ 7-803 of Chapter 8 of Title 7 of the Administrative Code of the City of New York) which contains provisions similar to the federal statute.  New York City contributes as much as one-half of the Medicaid costs that New York State incurs for New York City.  (New York State pays approximately 50% of total New York Medicaid costs and the federal government pays the remainder.)  A defendant is liable to the United States if it (1) knowingly (2) presents or causes to be presented (3) to an officer or employee of the United States Government (4) a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1).  A defendant may also be liable for (1) knowingly (2) making or causing to be made (3) a false record or statement (4) to obtain payment of a false or fraudulent claim, 31 U.S.C. §3729(a)(2), or for conspiring to commit or cause such false or fraudulent claims.  In addition, Section § 1128B(c) of the Act, 42 U.S.C. § 1320a-7b(c), makes it a felony to "knowingly and willfully make[] or cause[] to be ma[d]e, or induc[e] . . . any false statement or representation of a material fact with respect to the conditions or operation of any . . . entity in order that such . . . entity may qualify (either upon initial certification or recertification) as . . . an entity . . . for which certification is required under a State health care program."

25.    A "part-time clinic" is a satellite of a hospital or other licensed facility, located in proximity to the facility and in an area where there exists a need for services to be provided under the aegis of the facility.  The New York State Department of Health ("DOH") is required to approve the establishment of part-time clinics.  Section 700.2 of Title 10 of the *Official Compilation of Codes, Rules and Regulations of the State of New York ("NYCRR")* defines "part-time clinic site" as follows: "Part-time clinic site shall mean an ambulatory care program site operated less than 60 hours per month by a general hospital or a diagnostic or treatment center which is approved to operate part-time clinics.  A part-time clinic site is a site other than the primary delivery site(s) listed on the primary facility's operating certificate."

26.    Section 703.6I of Title 10 of NYCRR, as adopted in 1983, included the following list of requirements for a licensed facility that operated a part-time clinic, none of which, it is alleged, were met by TFH:

Policies and procedures. (1)  The governing authority shall ensure the development and implementation of written policies and procedures specific to each part-time clinic site which shall include but need not be limited to:

(i)      maintenance and storage of medical records;
(ii)     handling and storage of drugs;
(iii)    provision and storage of sterile supplies;
(iv)     disposal of solid waste;
(v)      handling of patient emergencies; and
(vi)     a fire plan.

27.    Section 703.6 was expanded when the new version of the regulations was adopted in 2000:

8

*Policies and procedures.* (1) The operator shall ensure the development and implementation of written policies and procedures specific to each part-time clinic site which shall include, but need not be limited to:

- (i)     security, confidentiality, maintenance, access to and storage of medical records for each patient, including documentation of any diagnoses or treatments;
- (ii)    handling and storage of drugs in accordance with State law and regulation;
- (iii)   provision and storage of sterile supplies including plans for sterilization or disposal of contaminated supplies and equipment;
- (iv)    disposal of solid wastes and sharps;
- (v)     handling of patient emergencies, including written transfer agreements with hospitals within the service area;
- (vi)    a fire plan consistent with local laws;
- (vii)   credentialing of staff by the governing authority of the operator and assurance that only appropriately licensed and/or certified staff perform functions that require such licensure or certification;
- (viii)  quality assurance/improvement initiatives coordinated with such activities at the operator's primary delivery site(s);
- (ix)    utilization review;
- (x)     community outreach efforts designed to ensure that community members are aware of the availability of and the range of clinic services and hours of operation; and
- (xi)    assurance that patients can access necessary services without regard to source of payment.

28.    Section 703.6I(2) of the 1983 version of the regulations stated:

(2) Services provided at a part-time clinic shall be limited to low-risk diagnostic and treatment procedures and examinations which do not normally require back-up and support from the primary delivery site. The following services shall not be provided at a part-time clinic site:

(iii) services other than those available at the primary delivery site(s) listed on the primary facility's operating certificate

29.    The nearly 300,000 patient-visits that are alleged to have been falsely billed were for services that were not available at the "primary delivery site" of TFH, but for certain psychological sessions. As to the latter, TFH could not bill for them,

either, because TFH was not in compliance with all the other pertinent regulations and because these services were not performed at part-time clinics that were run by TFH.

**Overview of Applicable Medicaid Requirements**

   30. The New York State Department of Social Services administers the New York State Medicaid program, which pays for necessary medical services provided by authorized Medicaid providers to individuals and families with low incomes and limited resources. This program, which became law in 1965, is jointly funded by the Federal, State and City governments, and is administered by the State. Consistent with the mission of the program, Medicaid pays a premium rate to healthcare providers who operate small "off-site" clinics in underserved, poor neighborhoods.

   31. These clinics are "part-time" operations which, by New York State law, cannot provide healthcare services in excess of 60 hours per month. These part-time clinics are permitted to bill Medicaid at the same rates as their parent facility bills for professional services. Whereas a full-time facility must undergo rigorous state inspection and scrutiny in order to become licensed, in the late 1990s, a facility wishing to establish a part-time clinic was required only to register with the State the existence of the remote site.   32. "The New York State Medicaid Program's "Information for All Providers – General Policy" states, "By enrolling in the Medicaid Program, a person agrees: . . . To submit claims for payment for services actually furnished, medically necessary and provided to eligible persons . . .[and] to comply with the rules, regulations and official directives of the Department." New York State Medicaid Program, "Information For All Providers, General Policy," pages 14 and 15.

33.    When submitting a Medicaid claim, the provider must submit a Claim Certification Statement that includes the following: "I (or the entity) have furnished or caused to be furnished the care, services and supplies itemized in accordance with applicable federal and state laws and regulations." New York State Medicaid Program, "Information for All Providers, General Billing," page 7.

34.    The provider also agrees, by making a Medicaid claim, to be "subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the DOH as set forth in Title 18 of the Official Compilation of Codes, Rules and Regulations of New York State and other publications of the Department, including Provider Manuals and other official bulletins of the Department." Furthermore, "[a]ll providers, either direct billers or those who bill through a service bureau or clearinghouse, must file a notarized Certification Statement with NYS Medicaid for each ETIN [New York State Electronic Transmitter Identification Number] used for the electronic billing." New York State Medicaid Program, "Clinic, Billing Guidelines," page 4.    35.    TFH, in concert with other Defendants, submitted to Medicaid false claims for payment for tens of thousands of annual patient-visits at these part-time clinics for which TFH was not entitled to be paid. Rather, these services should have been billed to Medicaid by or on behalf of the therapists or social workers who actually provided them. Medicaid's reimbursement rates for these providers ranged from $16 to $30 per patient visit for the speech, occupational and physical therapies (psychiatric social worker rates were higher), as compared to the $218 per visit that were billed by TFH once its plan to seek the higher reimbursements from Medicaid was operational.

36.     The principal Defendant entities with which TFH contracted to provide therapists/social workers and carry out their plans are Renaissance Healthcare Options, LLC ("Renaissance") and Global Communications Services, Inc. ("Global").  In addition to these entities, the individual Defendants managed or advised TFH with regard to the false billing of Medicaid.   The Defendant Staten Island University Hospital ("SIUH") was also a participant in and a beneficiary of the Medicaid reimbursements that were obtained.

37.     The DOH-approved rate for TFH was determined primarily based upon TFH's representation that it was a "diagnostic or treatment center" ("D&T" Center), which it was not,  because it did not (1) amortize its infrastructure costs associated with TFH's ship over the anticipated volume of patient visits and it did not have and was not capable of providing (2) sophisticated diagnostic and treatment modalities.  Moreover, TFH ceased using its ship in 2003 and sold it to a buyer to turn it into a restaurant, bringing about a substantial reduction in TFH's overhead costs.  All these factors, combined with enormous increases in its number of patient visits, rising from 15,000 in 1997 to an average of almost 70,000 for the years 1998 through 2003, obligated TFH to file with DOH to have its $218 reimbursement rate amortized and revised downwards, but it never did so.

38.     TFH's falsely obtained $63 million in Medicaid reimbursement was divided, $133 (61%) to TFH and $85 (39%) to the service-provider Defendants. Entities and persons who shared in these funds were parties to the alleged frauds committed against Medicaid. As a result of the Defendants' plans, TFH was able to increase its number of Medicaid patient-visits from less than 15,000 per year to a height of 94,000

per year. These patient visits occurred at as many as 90 separate locations that the Defendants falsely advised DOH and Medicaid were operated by TFH.

40.    TFH's annual revenues from Program Services, *e.g.*, occupational, speech and physical therapy and psychiatric counseling were enhanced seven-fold. TFH's Program Revenues in 1997, from services other than occupational, speech and physical therapy were approximately $1.6 million. As the Defendants' plan grew, these therapeutic Program Revenues went to $2.9 million in 1998 and, in successive years, 1999 through 2004, respectively, rose to $10.1, $12.8, $11.9, $11.9, $9.8 and $3.6 million.    41.    Starting in 1997, Berger advocated to the board of trustees that TFH contract with Defendant Renaissance Healthcare Options, LLC ("Renaissance") so that TFH could bill Medicaid $218 for each therapeutic service. Berger introduced Terry Blackwell, his personal friend and a representative of Renaissance, to TFH. Once TFH entered into a contract with Renaissance, and similar ones with vendors Global Communications Services, Inc. ("Global"), CERG and others, following Berger's advocacy, these TFH contracts were administered by Berger.

42.    Renaissance was, in effect, an employment agency for therapists, [to] serve people with developmental disabilities, chemical dependency, mental illness, and physical disabilities.". Renaissance arranged "sites," usually single rooms in many adult and family homes, as well as residence and day treatment centers, and recruited therapists to treat patients at those locations. Renaissance's website describes itself as "a private company that subcontracts with licensed healthcare providers to serve individuals with disabilities. Renaissance provides Occupational, Physical, and Speech therapies, and Psychological Services. . . . Renaissance Healthcare designs and implements

programs that serve people with developmental disabilities. Services are delivered in
community settings." It states that it identifies and organizes licensed independent
therapists, markets them, and designs their outcome-based services and programs. Thus,
as Renaissance represented on its website it, and not TFH, was the provider of the
therapy services alleged herein.

      43.    When hired by TFH in 1997 to be chief operating officer, Berger
had little clinic management experience. He became aware of the high rate of $218 per
patient-visit that TFH received from Medicaid for services provided at TFH sites. At that
time, TFH had a half-dozen part-time clinics. Berger introduced Defendant Blackwell to
TFH board and who, with Defendants Berger, Muir and O'Connell, introduced to TFH
the idea of billing Medicaid $218 under TFH's name and rate for therapy treatments
(occupational, speech and physical therapy, psychiatric counseling) that, prior thereto
were being provided by individual therapists associated with Renaissance or other
vendors. TFH, itself, had not been providing these types of services at its primary site or
elsewhere, prior to Berger's "Renaissance" proposal.

      44.    The therapeutic services that Berger and Blackwell were proposing
be billed to Medicaid by TFH were already being provided by therapists and social
workers associated with Renaissance at dozens of sites throughout the New York
metropolitan region, usually at day facilities for the developmentally and mentally
disabled. As it was explained to the board by Berger, Blackwell, Muir, O'Connell and
Varone, Medicaid could be charged TFH's per-patient visit rate of $218, as compared to
the $16 to $30 that the therapists were then billing for their services. These Defendants
explained to TFH board that TFH would have no substantial new duties or

responsibilities associated with these therapy and mental health treatments, and would

have no operational responsibilities whatsoever. The plan was that Renaissance's

previously designated and operated sites would be designated as TFH's own part-time

clinics.

        45.     Rick Varone told TFH that SIUH owned 40% of Renaissance and

urged it to implement the plan.

        46.     TFH's Board of Trustees considered and adopted the plan. The

proposed arrangement was also reviewed by TFH's law firm and Peter Epp, the leading

healthcare expert at TFH's accounting firm, GGK. Epp told TFH that the proposal was

legal and a good deal for TFH.

        47.     In late 1996, Renaissance presented TFH with a proposed contract,

which was reviewed and approved. On February 1, 1997, TFH and Renaissance executed

the contract.

        48.     Renaissance's web site stated that "Renaissance Healthcare

Options, LLC is a private company that subcontracts with licensed healthcare providers

to serve individuals with disabilities. Renaissance provides Occupational, Physical, and

Speech Therapies, and Psychological Services ... Services are delivered in community

settings"    49.     A Renaissance letter dated June 30, 1997 made it clear that the so-

called TFH part-time clinics were, in actuality, Renaissance operations. In the letter,

Renaissance President Donald Muir wrote that "J&R Therapy and Renaissance would

provide..." the therapies envisioned by the plan, and "would supply on-site management

as well as the clinical and clerical staff under a technical service agreement with the

Floating Hospital."

.

50.    In its contract with Renaissance, TFH's responsibilities were quite limited: TFH was to obtain necessary DOH approvals to "establish Article 28 extension and part time clinics" and, in essence, to remain law-abiding and maintain its insurance coverage. The contract emphasized that TFH was not to take on additional responsibilities; rather, TFH was limited to its "present responsibility of administration and operation oversight Renaissance's responsibilities under the contract were extensive and established that it, not TFH, ran the therapeutic programs:

> "Develop, implement and monitor operations, policies, procedures, quality assurance, management information systems that supported new program and service initiatives.
>
> Provide the therapeutic and clinical staff to support operation of clinic sites."

52.    Despite its minimal role, TFH was entitled under the contract to retain all but $85 of the reimbursement of $218 per patient-visit. The $85 paid to Renaissance was, however, far higher than the $16 to $30 that was billed to Medicaid prior to implementation of the plan. Under the contract, Renaissance was to invoice TFH for the therapy services, and TFH would bill Medicaid under TFH's name and Medicaid provider number, as though TFH had provided the services itself.

53.    The contractual provision on "Restrictive Covenant – The Floating Hospital Obligation"), revealed the nature of the agreement. During the "term of this Agreement and for a period of one year thereafter," TFH was not to "Provide Therapy Services, directly or indirectly, to any person who was a patient at agencies or sites which were developed and/or managed by the Renaissance." This provision made it clear that the parties' intended that TFH was to have no relationship with the tens of thousands of therapy patients annually for whom it nevertheless would bill Medicaid as though it were

their service provider. TFH was not the provider of the nearly 300,000 therapy patient-visits that it billed to Medicaid, because if it had been, it would not have agreed to the "Restrictive Covenant" that required it to abandon its care-giver responsibilities to 50,000 patients annually.

54.    Renaissance's contractual arrangement with TFH remained in effect from 1997 through at least 2004.

55.    In 1998, Defendant Blackwell, who had been the first person to bring Renaissance to TFH's attention, introduced it to another vendor, Defendant Global, which offered and then performed services similar to those of Renaissance.

56.    In 1996, TFH's "Program Revenue" (virtually all from Medicaid) was approximately $1.6 million. Over the next eight years, however, as a result of the plan, TFH's Program Revenues, which were caused by and shared with all the other Defendants, increased significantly. New revenue from the part-time clinics that TFH falsely claimed as its own clinics exceeded $63 million; these revenues were generated by 294,406 claims for therapeutic services performed at the part-time clinics filed by TFH and it was reimbursed $218 for each claim; and TFH's costs for the therapeutic services were only $25 million.

57.    TFH was not the provider of the therapy services that were billed to Medicaid and it was not entitled to the $63 million in Medicaid reimbursement.

58.    TFH's major increases in patient-visits were not attributable to TFH operations. TFH expended no efforts or funds to generate or support the tens of thousands of additional patient-visits occurring each year. Furthermore, TFH would not have been capable of supervising and operating part-time clinics that produced a 500%

increase in patient-visit load. TFH's main facility and half-dozen part-time clinic sites could collectively accommodate only a few thousand patients per year, and not the tens of thousands of new patients produced by Renaissance and the other therapy vendors for which TFH billed Medicaid.

59.    TFH's reports frequently contradicted one another and are replete with self-serving and demonstrably false statements, strongly suggestive of TFH's intentional effort to hide the source of its $63 million in Medicaid reimbursement.

60.    A member of TFH's Board of Trustees, Linda O'Leary, an attorney, admitted that "for lending its name to Renaissance," TFH was able to improve its revenues. She and other members of TFH's Board of Trustees were aware of the fraud that the Board had approved, encouraged and allowed to be perpetrated.

61.    TFH began billing Medicaid $218 per patient-visit even though there was no change in the therapists or the services from the pre-Renaissance period personnel. The majority of those same providers had previously been billing Medicaid $16 to $30 for services and they continued to see the same patients and continued to have the same relationships with them as they had before TFH was involved.

62.    The accounting firm of Goldstein Golub and Kessler, LLP ("GGK") has prepared TFH's annual financial statements and audits from at least the mid-1980s to the present, and could and should have addressed all financial irregularities.

63.    The facts as set forth herein demonstrate that the Defendants falsely claimed and falsely received, caused to have been falsely claimed and received, or conspired to have falsely claimed and received, substantial amounts of money falsely obtained from the United States, New York State and New York City, for Medicaid

services not provided by TFH. Nevertheless, TFH billed and was reimbursed by Medicaid.

## FIRST CLAIM

### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)
### Presenting False Claims for Payment

64.    Relator repeats the allegations contained in Paragraphs 1 through 63 above.    65.    Relator seeks relief against the Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1) and New York City Administrative Code, § 7-801, *et seq*. As set forth above, the Defendants knowingly, or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented, to an officer, employee or agent of the State of New York and of the Medicaid Program, false and fraudulent claims for payment or approval in connection with the submission of the requests for reimbursement under the Medicaid programs. The Medicaid Program paid TFH because of the fraudulent conduct of the Defendants. By reason of the Defendants' false and fraudulent claims, in which each of the remaining Defendants participated, the United States, the State of New York and New York City have been damaged in a substantial amount and therefore are entitled to multiple, treble damages under the United States and New York City False Claims Acts in an amount to be determined at trial, plus a civil penalty in the maximum amount permitted by law for each violation.

## SECOND CLAIM

### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(2)
### Use of False Statements

66.     Relator repeats the allegations contained in Paragraphs 1 through

65 above.     67.     The United States seeks relief against the Defendants under §

3729(a)(2) of the False Claims Act and New York City Administrative Code, § 7-801, *et

seq*. As set forth above, the Defendants knowingly, or acting in deliberate ignorance or in

reckless disregard for the truth, made, used, and caused to be made and used, false

records and statements, to get the TFH-Defendant's false or fraudulent claims paid or

approved by the Medicaid Program in connection with the submission, directly or

through the causing thereof of false and fraudulent requests for reimbursement under the

Medicaid programs.  The Medicaid Program paid such false or fraudulent claims because

of the acts and conduct of the Defendants.  By reason of the Defendants' false claims, the

United States, the State of New York and New York City have sustained damages in a

substantial amount and therefore are entitled to multiple, treble damages under the United

States and New York City False Claims Acts in an amount to be determined at trial, plus

a civil penalty in the maximum amount permitted by law for each violation.

### THIRD CLAIM

### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(3) and 3732(b)
### False Claims Act Conspiracy

68.     Relator repeats the allegations contained in Paragraphs 1 through

67 above.     69.     This is a claim for treble damages and for forfeitures under the

United States False Claims Act, 31 U.S.C. § 3729 *et seq*., as amended, and New York

City Administrative Code, § 7-801, *et seq*. Through the acts described above and

otherwise, Defendants entered into one or more conspiracies to defraud the United States, the State of New York and New York City through the submission of false and fraudulent claims and through the payment received by Defendants on these false and fraudulent claims. Defendants have also conspired to omit disclosure of or to actively conceal facts which, if known, would have reduced or eliminated government obligations to TFH-Defendant, which were knowingly shared by other Defendants. Defendants have taken substantial steps in furtherance of those conspiracies including, among other acts, preparing and causing the preparation of false Medicaid reimbursement claims and other documents and records and submitting such reports and other documents and records to the Medicaid Program for approval and payment. The Medicaid Program, unaware of Defendants' conspiracies or the falsity of the reports, documents and claims submitted by the Defendants and as a result thereof, has paid tens of millions of dollars in Medicaid reimbursements during the period 1997 to the present that they would not otherwise have paid. Furthermore, because of the false records, statements, claims, and omissions by Defendants, the United States, New York State and New York City have not recovered Medicaid funds from the Defendants that otherwise would have been recovered. By reason of Defendants' conspiracies and the acts taken in furtherance thereof, the United States, New York State and New York City have been damaged in an amount in excess of $63,000,000 in Medicaid funds.

WHEREFORE, Relator Matthew Leahey requests that judgment be entered in favor of the United States and New York City and against Defendants as follows:

      (a)      On the First, Second and Third Claims for relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2)), and New York City

Administrative Code, § 7-801, *et seq.*, for treble the United States'
damages, New York State's damages and twice New York City's damages,
in an amount to be determined at trial, plus a $10,000 penalty for each
false claim presented prior to September 29, 1999, and an $11,000 penalty
for each false claim presented after September 29, 1999 which caused
damage to the United States and a penalty of $15,000 for each false claim
presented to and/or caused damage to New York City;

(b)     On the First, Second and Third Claims for Relief, an award of costs
pursuant to 31 U.S.C. § 3729(a) and New York City Administrative Code,
§ 7-801, *et seq*;

(c)     awarding such other and further relief as the Court may deem just and
proper, and

(d)     a trial by jury is demanded.

Dated: New York, New York
       March 23, 2006

                    TROUTMAN SANDERS LLP
                    Attorneys for Relator Matthew Leahey

By:     _____
                    Philip Michael (PM 0881)
                    Richard Ackerman (RA 6066)
                    Charles P. Greenman (CG 2108)
                    Karen F. Lederer (KL 2768)

                    The Chrysler Building
                    405 Lexington Avenue
                    New York, New York 10174
                    (212) 704-6000